UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:18-CR-57-REW-HAI-14 |
| | ) | |
| v. | ) | RECOMMENDED DISPOSITION |
| | ) | & ORDER |
| DAVID LOWE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

*** *** *** ***

Following four psychological evaluations and a contested hearing (conducted in two segments), the undersigned finds that Defendant David Lowe is competent to proceed to trial.

## I. Background.

This case began with the issuance of a Superseding Indictment on March 21, 2019, charging Defendant with conspiring to distribute 500 grams or more of a mixture or substance containing methamphetamine and being a felon in possession of a firearm. D.E. 22. Defendant was arraigned on March 29. D.E. 97.

On April 19, 2019, Defendant, through counsel, filed a motion for a psychiatric examination. D.E. 153. Attached to the motion was a Knox County disability judgment from April 2010 naming Defendant's mother, Pauline Smith, as his guardian. D.E. 153-1. Based on the parties' positions at a subsequent hearing, the motion was also construed as a notice of an insanity defense under Rule 12.2(a). D.E. 180. The Court therefore ordered a psychiatric evaluation to determine Defendant's competency to stand trial and his sanity at the time of the alleged offense. *See id.*; D.E. 181.

Defendant was first evaluated at the Federal Detention Center in Houston, Texas. *See* D.E.

184. A report by forensic psychologist Tennille Warren-Phillips, Psy.D., was issued on July 22, 2019. D.E. 246. The Report found Defendant incompetent to stand trial. *Id*. at 12. Because of this incompetency finding, no evaluation of Defendant's criminal responsibility was undertaken. *Id*. at 1.

While Defendant was still out of this District, on June 27, 2019, a Second Superseding Indictment issued in this case. D.E. 228. Because Defendant's competency has remained unresolved, he has not yet been arraigned on the new indictment. Of the sixteen defendants in this case, all but Defendant have pleaded guilty. Fourteen codefendants have been sentenced. Defendant's trial was severed from that of his codefendants in October 2019, and is currently continued generally. D.E. 420.

After the Houston Report was circulated and Defendant returned, the undersigned conducted a hearing pursuant to 18 U.S.C. §§ 4241 and 4247(d) on August 12, 2019. D.E. 251, 253. Both parties stipulated to Dr. Warren-Phillips's qualifications and to the accuracy of the Report's contents and conclusions. D.E. 260. Neither side claimed to possess any evidence that would contradict the Report's findings. The government agreed that the evidence preponderated in favor of finding Defendant is incompetent to stand trial and requested the initiation of restoration proceedings. *Id*.

There was some equivocation in the Houston Report as to whether Defendant's apparent incompetence could be to some degree feigned. As noted in the undersigned's Recommended Disposition, the evaluator at Houston opined that Defendant "did appear to possibly suffer from a mental defect rendering him unable to understand the nature of the proceedings against him or to properly assist in his defense." D.E. 246 at 11. This finding was based on "a conservative approach," given some indication of malingering. *Id*. The Recommended Disposition described

2

certain aspects of the Houston Report:

>    The main issue with Defendant is that he has difficulty retaining information.  *See* D.E. 246 at 2.  Defendant reported that he had sustained a traumatic brain injury in a serious car accident, after which he was in a coma for weeks.  *Id*. at 3-4.  According to his mother, Defendant's memory was grossly impaired after the injury.  *Id*. at 4.  Indeed, during conversations, Defendant often needed things repeated throughout the evaluation.  *Id*. at 5.  Several psychological tests were administered, but some were discontinued either due to Defendant's impairment, his poor mood, or suspected malingering.  *Id*. at 5-7.

>    Defendant also had "an insufficient factual knowledge" about the charges against him.  D.E. 246 at 11.  Despite his prior legal cases, he "showed little knowledge of court and the legal process."  *Id*. at 9-10.  His language comprehension was "potentially inadequate to communicate effectively with counsel and assist in his defense."  *Id*. at 11.  There were also "observed deficits in his ability to make a reasoned choice about defense options."  *Id*.

>    Defendant was ultimately diagnosed with:

>    Major Neurocognitive Disorder due to Traumatic Brain Injury, Rule Out

>    Malingering, Rule Out

>    Amphetamine Use Disorder, Moderate, In Early Remission, In a Controlled Environment

>    D.E. 246. at 8. The Report noted a need to "rule out" neurocognitive disorder and malingering.  The problem is that "Records documenting his reported head injury and related impairment are very important to further understanding the validity of his reported impairment, but were not made available during this evaluation."  *Id*. at 9.  "An absence of critical medical records to substantiate the alleged disabilities handicapped the assessment process."  *Id*. at 11.  Defendant's prognosis was accordingly "guarded," based on the possibility that he could have been exaggerating his impairments.  *Id*.

D.E. 264 at 3-4.  The Court observed "it will be important going forward to determine how much of Defendant's issues with memory and communication are the result of his traumatic brain injury, and how much of his difficulties during the evaluation were exaggerated."  *Id*. at 4.

No objections were filed, and Judge Wier adopted the recommendation on August 19, 2019.  D.E. 267.  Defendant was ordered transported to FMC Butner in North Carolina for

competency evaluation and attempted restoration. D.E. 280. There was a backlog of competency evaluations in the federal system, and Defendant was not transported to Butner until late November 2019. D.E. 358, 422, 428. Defendant's evaluation period ended on March 24, 2020. D.E. 567. On April 3, 2020, the Court received from FMC Butner the competency report and certificate of restoration of competency. D.E. 574, 576. Defendant was ordered returned to this District. D.E. 576. He arrived on June 11, 2020. D.E. 601. The final hearing, initially set for June 19, was continued five times upon the defense's motion. *See* D.E. 615, 621, 638, 643, 656.

Then, on October 5, 2020, the defense sought permission to conduct a third competency evaluation with Dr. Dustin Wygant under 18 U.S.C. § 3006A. D.E. 661. Dr. Wygant evaluated Defendant at the Laurel County Correctional Center on November 16, 2020, and his subsequent report was filed on February 5, 2021. D.E. 699. Dr. Wygant found Defendant not competent.

The final competency hearing was conducted on April 15, 2021. D.E. 714. For the government, two evaluators from FMC Butner, Dr. Tracy O'Connor Pennuto and Dr. Kristina Lloyd, testified by video. For the defense, Dr. Wygant appeared by video, and Defendant's mother, Pauline Smith, testified in person. D.E. 714, 715. As agreed by the parties, the government presented its case first. As will be explained in more detail, near the end of the final hearing, the parties became aware that Defendant may have suffered seizures following his evaluations—a circumstance that could potentially affect his present competency. Defendant ultimately obtained an additional psychological evaluation under § 3006A (by neurologist Dr. E. Andy Akan, M.D.), and the final hearing recommenced on January 21, 2022. At that hearing, two witnesses testified by video—Dr. Akan for the defense and Dr. Lloyd for the government.

Before the Court are the competency reports from FMC Houston (the "Houston Report," D.E. 246), FMC Butner (the "Butner Report," D.E. 575), Dr. Wygant (the "Wygant Report," D.E.

4

699-1), Dr. Akan (the "Akan Report," not previously filed in the record), the testimony at the April 14, 2021 hearing (transcript at D.E. 749), and the testimony at the January 21, 2022 hearing.

## II.  Legal Standards

Section 4241 codifies the competency principles of *Dusky v. United States*, 362 U.S. 402 (1960) (per curiam).  To be competent, a defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him."  *Dusky*, 362 U.S. at 402; *see also* 18 U.S.C. § 4241(a) (phrasing test as whether defendant is "unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense"); *United States v. Nichols*, 56 F.3d 403, 410 (2d Cir. 1995) (applying the "two-prong" competency test from *Dusky*).

Section 4247(d) governs the hearing and assures certain trial-type rights. These include rights of confrontation, cross-examination, and participation.  *See* 18 U.S.C. § 4247(d); *see also* 18 U.S.C. § 4241(c) (referencing § 4247(d) for hearing procedure).  Ultimately, per § 4241(d), a defendant is not competent if, "after the hearing, the court finds by a preponderance of the evidence that the defendant" meets the incompetency definition of § 4241(a).

Case law is divided as to which party bears the burden of persuasion on a competency motion, and the Sixth Circuit has not resolved the issue in a published opinion.  *See United States v. Dubrule*, 822 F.3d 866, 876 n.3 (6th Cir. 2016) ("[T]his Circuit has never explicitly stated who bears the burden of proving a defendant's competency."); *United States v. Calhoun*, No. 7:20-CR-03-REW, 2020 WL 7408220, at *4 (E.D. Ky. Dec. 17, 2020) ("In the Sixth Circuit there is no binding authority establishing which party bears the burden of proof to establish pretrial competency.").  The Supreme Court has indicated the burden allocation only matters in a "narrow class" of cases where proof is "in equipoise."  *Medina v. California*, 505 U.S. 437, 449

(1992).

In accordance with its usual practice, the Court placed the burden of persuasion on the movant, which is the defense. D.E. 264 at 3; *see also United States v. Simmons*, 993 F. Supp. 168, 170 (W.D.N.Y. 1998) ("The burden to prove a lack of competence is on the defendant."). At the April 2021 hearing, the defense objected to bearing the burden of persuasion. The defense argued that the *status quo* is the Court's prior ruling that Defendant is not competent, so the government should bear the burden of overcoming the *status quo*. The Court reserved the burden question. The Court now reaffirms its position that Defendant, as movant, continues to bear the burden of persuasion. This burden allocation is consistent with the statutory framework described above.

### III.  The Butner Report

Noteworthy in the Butner Report is the extensive battery of tests administered to Defendant. Butner Report at 1-2.

The authors of the Butner Report considered Defendant "a poor historian as he often reported he did not remember specific details or dates" about his past. Butner Report at 2. He "described himself as a 'methhead.'" *Id*. at 3. Defendant had "significant speech articulation deficits" that made him difficult to understand; however the content of his speech was "relevant and within normal limits." *Id*. at 6. Defendant was placed in a special housing unit shortly after his arrival for allegedly threatening his cellmate. *Id*. at 5. He also fell at FMC Butner and broke his nose. *Id*. at 6. During his time at Butner, Defendant was considered "behaviorally and psychologically stable." *Id*. at 7.

Defendant was given an MRI to examine his brain for any damage resulting from his traumatic brain injury ("TBI") associated with the February 2010 auto accident. Butner Report at 6. "Results indicated two tiny nonspecific T2 hyperintense foci in the right frontal lobe were

noted; otherwise results were normal." *Id*.

Butner offered an instructional group "aimed at increasing . . . understating of the legal process, courtroom procedures, and roles and functions of the courtroom participants" Butner Report at 6. Lowe attended the group in December 2019 but did not actively participate. He did not attend the group in January and February. *Id*.

Dr. Pennuto conducted a neuropsychological consultation of Defendant at Butner (Butner Report at 7-13), which Dr. Lloyd incorporated into her competency assessment. Although Defendant was difficult to understand due to his speech disorder and accent, "[h]is thought processes were linear and logical" and "no overt delusional material was elicited." *Id*. at 8.

The Houston report noted that Defendant may have been malingering or not fully engaging with the psychological tests. Butner Report at 7. To measure his effort Dr. Pennuto at Butner administered the Rey 15 Item Test. *Id*. at 8. His score of 9 out of 15 "suggest[ed] adequate effort." *Id*. On a validity measure embedded in the CVLT-3, Defendant correctly identified all 16 words, "reveal[ing] no inconsistent endorsements." On other embedded performance validity indicators, however, Defendant's "performances were variable." *Id*. at 9. Given that his effort appeared variable, the evaluator concluded that "the concurrently administered neuropsychological measures are likely to provide a broadly accurate reflection of his cognitive functioning, but may underestimate his abilities somewhat." *Id*.

The next key issue (other than assessing Defendant's brain injury and effort) was assessing his "premorbid function." That is, how does Defendant perform post-brain-injury compared to pre-brain-injury? The WRAT-4 test assessed Defendant's reading ability "as an estimate of premorbid intellectual functioning." Butner Report at 9. His reading performance "fell in the borderline range, and was equivalent to 5.7 grade level." This score "falls mildly below his

reported educational attainment," but is "broadly consistent with his educational and occupational history, and is likely a good estimate of his premorbid intellectual functioning." *Id.*

Against this backdrop, Dr. Pennuto considered test results that measured Defendant's executive functioning, learning and memory, language skills, visuospatial construction, and emotional functioning. Butner Report at 9-11. Her conclusions included the following:

> Mr. Lowe's cognitive performances fell broadly in the low average to borderline range across cognitive domains . . . . Mr. Lowe showed mild relative weaknesses with borderline to impaired performances on a verbal test of learning and memory (narratives), and impaired performances on a nonverbal test of learning and memory (visual designs). On the verbal test, he appeared overwhelmed by the volume of information in the short story, and the inability to have the information repeated. . . . [H]e greatly benefits from repetition of verbal information. . . . Mr. Lowe's intellectual ability was not formally assessed in the current evaluation. However, his reading level falls in the borderline range . . . .

> His weaker learning and memory performances appear to be due to the inability to repeat the verbal information, and his hasty, imprecise approach to the visual test, rather than to true memory deficits. He also presented behaviorally with some evidence of frontal or executive weakness (impulsivity, stimulus-boundedness, disinhibition), though this was not borne out on formal testing. This behavior may be consistent with his history of ADHD, though may also be due to a reported history of head trauma (no medical records were available for review), and history of chronic methamphetamine abuse. . . . Mr. Lowe appeared to underreport his experience of anxiety and depressive symptoms, emotional distress can affect cognitive functioning, and must be considered a potential contributing factor. . . .

> There is little evidence of continued sequelae from his reported brain injury with the exception of Mr. Lowe's dysarthric speech. As noted, however, this affects the articulation but not the content of his speech, and his language abilities appear otherwise intact. . . . Mr. Lowe certainly did not demonstrate the significant cognitive deficits required for a diagnosis of major neurocognitive disorder. In fact, his mild weaknesses did not even rise to the level of the "modest" cognitive decline required for the diagnosis of a mild neurocognitive disorder.

> . . . .

> Although Mr. Lowe has a documented history of a TBI and has reported associated cognitive impairments, neuropsychological testing revealed an intact neuropsychological profile that is consistent with his premorbid functioning.

*Id.* at 11-13. Given these findings, the Butner Report offered a single diagnosis: "Stimulant use

8

disorder, moderate, amphetamine-type substance, in early remission, in a controlled environment." *Id*. at 12.

To assess his understanding of court proceedings and ability to assist his attorney, Defendant was given the R-CAI. Butner Report at 13. "Mr. Lowe answered the questions correctly in all the areas and only needed education on three concepts: plea of not guilty by reason of insanity, the difference between a bench trial and jury trial, and constitutional rights given up if one accepts a plea agreement."

> Mr. Lowe identified his charges as "conspiracy . . . something to do with meth" and "possession of a handgun." He correctly identified his charges are felonies and described a felony charge as more serious than a misdemeanor charge. He indicated he could receive a sentence of "10 years to life" . . . .

> Mr. Lowe described his plea options appropriately and indicated he would consult with his attorney in determining how to plea. . . .

> Mr. Lowe identified his attorney by name and expressed confidence in him. He indicated he could help his attorney by talking to him and "write down if he can't understand me."

*Id*. at 13-14. In summary, Defendant "displayed adequate factual knowledge" and "adequate rational understanding" of the legal proceedings in his case. He "was able to learn and retain new information presented to him." He appeared "able to appropriately manage his behavior within the courtroom." He "demonstrated the ability to consult with his attorney" and "understood he could consult with his attorney to develop appropriate defense strategies and make appropriate legal decisions." *Id*. at 15.

The Butner Report thus concluded Defendant was competent to stand trial. Butner Report at 16. "Given he does not have a severe disease or defect, his competency is not expected to change over time." *Id*. The Butner Report did not assess Defendant's sanity at the time of the offense.

# IV.  The Wygant Report

Dr. Wygant evaluated Defendant over a four-hour period at the Laurel County Correctional Center on November 16, 2021.  Wygant Report at 1.  Dr. Wygant administered two tests designed to evaluate Defendant's effort level.  The first was the Rey-15 Item Test.  *Id*.  This test was also administered at Butner.  Defendant scored 9 out of 15 (suggesting adequate effort) at Butner, but 15 out of 15 with Dr. Wygant.  *See id*. at 6.  The second was the TOMM.  This test was also administered at Houston.  At Houston, Defendant scored "below chance," which suggested he "knew the correct answer, but intentionally responded incorrectly."  Houston Report at 8.  "He scored much, much worse than genuinely impaired patients in clinical normative groups for dementia, traumatic brain injury, cognitive brain injury, and aphasia."  *Id*.  With Dr. Wygant, Defendant received TOMM scores of "86% on Trial 1 and 90% on Trial 2," which "are in the passing range and suggest that he put forth good effort and did not feign neurocognitive deficits."  Wygant Report at 6.

Dr. Wygant also administered three evaluative psychological tests.  First, the KBIT-2 is a brief intelligence test.  Defendant scored "75 on the verbal index, which falls in the below average range and at the 5th percentile," and 90 on the non-verbal matrices subset, "which is in the average range (25th percentile)."  Defendant's composite score "was 82, which is in the below average range (12th percentile)."  Wygant Report at 6.

Second, the Trail Making Test is "measure of visual motor tracking and cognitive flexibility."  Wygant Report at 6.  Defendant scored "borderline" (13th percentile) on the visual tracking and attention portion.  *Id*.  His performance on the second part "was in the lower extreme range (less than 1st percentile)."  *Id*.  Defendant "took a long time to complete the task and exhibited significant difficulty maintaining the task (switching between ascending numbers and

letters)." *Id.* According to Dr. Wygant, Defendant's performance suggests "significant impairment with respect to visual attention, tracking, and mental flexibility." *Id.*

Third, Defendant was given the RBANS, which assesses various areas of neurocognitive functioning. Wygant Report at 6.

> Overall, Mr. Lowe performed in the extremely low (impaired) range on the RBANS, achieving a Total Score of 54 (less than 1st percentile compared to others his age). His worst performance was on subtests that measured immediate and delayed memory. . . . Mr. Lowe will likely experience difficulty when asked to recall things . . . . He also scored in the extremely low range on subtests that measure attention and visual-spatial/constructional abilities. This suggests that Mr. Lowe will have difficulty sustaining his focus, which is necessary to encode things into memory for later retrieval. His highest score was on subtests that measure language abilities, which was in the low average range.

*Id.* at 6-7.

Based on these tests, Dr. Wygant offered three diagnoses:

- Major Neurocognitive Disorder, Secondary to Traumatic Brain Injury

- Unspecified Depressive Disorder

- History of Stimulant Use Disorder (Amphetamine), Currently in Remission, Currently in a Controlled Environment

Wygant Report at 7.

Dr. Wygant explained at the hearing that he has designed his own series of questions to evaluate a person's ability to understand the legal proceedings and assist the attorney. D.E. 749 at 97. Dr. Wygant presented these questions to gauge Defendant's command of legal topics and his reasoning ability about his case. Wygant Report at 7.

Here, Defendant's performance diverged sharply from his performance at Butner. Concerning the charges, Defendant expressed confusion over the concept of "conspiracy" and the term "mixture" in the Indictment. Wygant Report at 7. Defendant told Dr. Wygant, "I should be going home. I got like 20 months." *Id.* at 8. Unlike at Butner, Defendant "expressed mixed

feelings about his attorney." He said his lawyer "works for the court." He did not understand that "his competency assessments have slowed down the process." Defendant was "unsure of the things he could do to assist his attorney in his criminal offense," he "was unsure of the prosecutor's role in the case," he "reported a cynical view of judges." *Id.* In stark contrast to his behavior at Butner, Defendant

> was unable to explain how a plea bargain works . . . . The concept was explained by the examiner and he still impressed as confused about it. He was not able to explain how he would evaluate whether a plea bargain was a good deal, aside from discussing it with his legal counsel.

*Id.* at 9.

Dr. Wygant explained in summary that Defendant "impresses as a marginally-functional individual." Wygant Report at 9. He has "a significant speech articulation impediment," and his cognitive functioning "appears to be significantly compromised," presumably due to the 2010 brain injury. *Id.* at 10. Defendant also seemed depressed and has struggled with drug addiction. *Id.* Dr. Wygant noted that Defendant's "presentation" was "in stark contrast to his presentation during his two previous competency evaluations." *Id.* At Houston, there were significant malingering concerns, which Dr. Wygant did not experience. And at Butner, neuropsychological testing "revealed few indications of neurocognitive impairment." *Id.* Butner's diagnosis of no neurocognitive disorder differs sharply from Dr. Wygant's diagnosis of "Major Neurocognitive Disorder."

On the ultimate question of competency, Dr. Wygant opined "the results of the current evaluation indicate within a reasonable degree of scientific certainty that Mr. Lowe has a mental defect in the form of a Major Neurocognitive Disorder Secondary to Traumatic Brain Injury. His cognitive deficits include poor memory, attention, and executive functioning." Wygant Report at 11. Further, "it appears that Mr. Lowe has some (albeit limited) ability to understand the nature

and consequences of the proceedings against him in a manner that is consistent with USC Title18 § 4241(a)." *Id*. Finally, "within reasonable scientific certainty . . . Mr. Lowe is significantly limited in his ability to assist properly in his defense." *Id*. These conclusions were based in part on Defendant's "clear deficits in attention and memory," his "cursory understanding of the charges," and his inability to explain how he would rationally evaluate a plea offer. *Id*. Dr. Wygant opined that Defendant "has impaired decision-making ability" and a limited "ability to provide the type of detailed information that would be needed to effectively plan for a defense." *Id*. at 12. Defendant's "deficits in attention and memory may also attenuate his ability to adequately track information during the course of a trial" and process and retain that information. *Id*. Thus,

> Mr. Lowe has a mental defect (neurocognitive disorder) that impacts his ability to assist properly in his own defense. He does appear to have some (albeit limited) ability to understand the nature and consequences of the proceedings against him. This implies that while he may possess some foundational aspects of competency, he appears to lack the rational and decisional capacity often required of defendants in a trial setting.

*Id*. Dr. Wygant found Defendant not competent to stand trial. *Id*. at 11-12.

## V. The April 2021 Hearing

The first witness at the April 14, 2021 final competency hearing was Dr. Tracy Pennuto. Dr. Pennuto earned a bachelor's degree in psychology from the University of Maryland, a master's degree in general and experimental psychology from the University of West Florida, a J.D. from Golden Gate University and a Ph.D. in clinical psychology from Palo Alto University. D.E. 749 at 12-13. She has worked as a neuropsychologist at Butner since August 2010. *Id*. at 13. Dr. Pennuto explained that she performed as a consultant on this examination, and Dr. Lloyd made the ultimate competency recommendation. *Id*. at 23.

Dr. Pennuto discussed the evidence in the Houston Report that Defendant had been malingering or making little effort. She said that, compared to his behavior at Houston, Defendant

13

was "much better engaged" during his time at Butner.  D.E. 749 at 21.  Sometimes he made a good effort during his examinations, sometimes he did not.  According to Dr. Pennuto, Defendant can track, comprehend and process, but he often asked for things to be repeated and he was unable to repeat things verbatim.  *Id*. at 34.  Defendant tended to become more frustrated as testing progressed and he became more "cognitively taxed." *Id*. at 35.  Although Defendant's effort during the evaluation was "variable" or "inconsistent," Dr. Pennuto ultimately found no indication of malingering.  *Id*. at 43.  She also explained that frustration and less-than-optimal effort were not indicative of neurocognitive disorder.  *Id*. at 56.

Concerning Defendant's MRI results, Dr. Pennuto said that one cannot diagnose a neurological disorder from imaging alone.  She relied on her observations and tests rather than the MRI's detection of spots on Defendant's frontal lobe.  D.E. 749 at 22.

Dr. Pennuto testified that she determined no diagnosable neurocognitive disorder in Defendant—neither a major nor mild one.  D.E. 749 at 30.  She explained that determining a TBI-related neurocognitive disorder involves assessing whether a decline in cognitive function occurred in comparison to his functioning before the injury.  *Id*. at 24.  She explained that reading ability remains stable over time, so the WRAT-4 test can accurately capture a person's premorbid level of functioning.  *Id*. at 37.  The RAT4 results are combined with demographic information. Here, Defendant was schooled to the 9th grade; he worked at a factory and a sawmill and helped build houses.  Given all this data, Dr. Pennuto detected no post-injury cognitive decline.  *Id*. at 24-25.

When asked about the Houston Report's finding of non-competency, Dr. Pennuto explained she thought the evaluator

> was cautious.  She had a briefer period of time to evaluate him.  And based on his poor effort on the testing that she administered, it was unclear to her whether or not

14

he had a neurocognitive disorder.  So in a cautious manner, she opined that he was not competent so that he could be further assessed.  That's my understanding.

D.E. 749 at 54.

The second witness was Dr. Pennuto's Butner colleague Dr. Kristina Lloyd.  Dr. Lloyd has a bachelor's degree in criminal justice and psychology, a master's degree in clinical medical health, and a doctorate in psychology from Loyola University in Maryland.  She is a board-certified forensic psychologist and has done forensic psychology at Butner since 2014.  From 2011 to 2014, she served as chief psychologist at the federal prison in Schuylkill, Pennsylvania.  D.E. 749 at 58-59.  According to Dr. Lloyd, the Houston Report indicated that, while at Houston, Defendant was at times invested in minimizing his abilities.  *Id.* at 62.  In contrast, at Butner, Defendant consistently maintained he was competent and knew what was going on in his case.  *Id.* at 70.  Defendant, she said, has no "threshold condition that could impair his decision-making."  *Id.* at 65.

Dr. Lloyd explained that, although Defendant received some "borderline" or "impaired" results on the tests, these results did not translate to a deficiency in competency-related skills.  Defendant's only diagnosed disorder is substance abuse disorder, and this disorder does not affect competency.  D.E. 749 at 71-73.

The third witness was defense witness Pauline Smith, Defendant's mother, with whom Defendant lived.  She testified that Defendant was a different person after the January 13, 2010 auto wreck.  He had bad short-term memory and was like a little boy again.  He had to re-learn things.  He has not held a job since the accident, and tends to lose things.  He has speech problems and balance problems.  D.E. 749 at 79-89.

Ms. Smith said Defendant was not employed at the time of the accident, but he had worked at a London cookie factory, worked cleaning barrels at a store, and had done yard work.  D.E. 749

15

at 78-79.  She said Defendant was in a coma until about February 1.  Defendant then spent the rest of February 2010 at a rehabilitation facility.  *Id*. at 79-80.  Ms. Smith explained that she went to court to become Defendant's guardian upon the advice of a social worker at the rehabilitation facility.  *Id*. at 82.

Ms. Smith testified on cross-examination that Defendant has come to gradually do more around the house.  He dresses himself, showers, uses social media, uses the phone, and has friends she has never met.  D.E. 749 at 87-88.

The fourth and final witness was Dr. Dustin Wygant, the author of the most recent competency report.  Dr. Wygant has a bachelor's degree in psychology from Miami University, a master's and Ph.D. in clinical psychology from Kent State.  Since 2009, he has worked in the Eastern Kentucky University's psychology department.  He is currently EKU's director of clinical training for the doctoral program and has a private consultation practice.  D.E. 749 at 90-91.  Dr. Wygant testified that Defendant passed the tests that measured his effort, and he did not doubt that Defendant expended adequate effort during the evaluation.  *Id*. at 96-97.  Dr. Wygant pointed out that page 6 of his report contains an error; Defendant's score on the Trails test was low average and not "borderline."  *Id*. at 98.

Dr. Wygant testified that, given Defendant's composite IQ of 82 from the KBIT-2 test and the indications of impairment in all but language abilities on the RBANS test, Defendant may have difficulty tracking what happens at trial.  This could in turn affect his ability to assist in his defense.  D.E. 749 at 98-101.  Dr. Wygant diagnosed major neurocognitive disorder based on Defendant's RBANS score, along with the statements from his mother (and the guardianship documents) suggesting Defendant had become cognitively impaired since the automobile accident.  *Id*. at 100-01.

As for Defendant's understanding of his case and the legal process, Dr. Wygant testified that he has developed his own set of competency questions and tests. D.E. 749 at 97. According to Dr. Wygant, this questioning revealed significant memory deficits. Defendant also had difficulty understanding the concepts of "conspiracy" and "mixture." D.E. 749 at 102-03. On cross examination, Dr. Wygant explained that his set of competency questions has not been peer-reviewed or evaluated by anyone else. *Id*. at 109. However, there do exist structured competency interviews that are peer-reviewed. *Id*. at 110. Dr. Wygant's competency interview does not include an embedded effort test. *Id*.

Dr. Wygant acknowledged that in his evaluation, which came 20 months after Butner's, Defendant appears more severely impaired and there are aspects of court procedure and personnel that Defendant understood at Butner, but failed to understand when interviewed by Dr. Wygant. D.E. 749 at 110-11.

Following Dr. Wygant's testimony, the government recalled Dr. Pennuto and Dr. Lloyd. Concerning the apparent decline from the Butner Report to the Wygant report, Dr. Pennuto could identify no neuropsychological reason why a person's abilities would decline so rapidly. Having already undergone similar testing, one would expect Defendant's performance to either remain stable or improve. D.E. 749 at 121-22. When asked whether the TBI could cause such a decline, Dr. Pennuto explained that the recovery curve typically lasts for the first six months. One would not expect to see any cognitive change two years after a TBI. There was no apparent explanation for a sudden decline ten years after the injury. *Id*. at 122.

Concerning the guardianship, Dr. Pennuto stated that Defendant surely needed assistance right after the accident. But, given that even Defendant's mother believes he has improved, Dr. Pennuto thought the guardianship should be reassessed. D.E. 749 at 123.

Dr. Pennuto was critical of some aspects of Dr. Wygant's report. She said it was not good clinical practice for Dr. Wygant to re-administer the same effort tests (the TOMM and Rey-15) that Defendant has already taken. The tests are designed to be novel. Defendant's score, Dr. Pennuto suggested, could indicate his recall of the previous tests rather than his actual effort. D.E. 749 at 118-19. Dr. Pennuto was also critical of Dr. Wygant's decision to only administer two out of three sections of the TOMM. Especially given Defendant's known history of effort issues, it would make "good clinical sense" to administer the third section, which tests retention of information. *Id.* at 119-120.

Cutting to the heart of the matter, Dr. Pennuto testified that the three cognitive tests administered by Dr. Wygant were not enough to render a diagnosis of major neurocognitive disorder. All three tests were designed to be brief screening measures. Dr. Pennuto said poor performance on these tests indicates a need for more comprehensive testing, like the testing done at Butner. D.E. 749 at 120-21.

Dr. Lloyd was skeptical of Dr. Wygant using a competency questionnaire he developed himself when there are well-respected standard measures available. D.E. 749 at 126-27. "[I]t's not clear to me why you would not use a forensic assessment instrument that is respected within the field as a good way of comprehensively and thoroughly assessing competency related skills and then just use your own measure that you made up. I'm not clear on the reasoning behind that." *Id.* at 127. When asked why Defendant apparently understood relevant roles and concepts at Butner that he did not understand with Dr. Wygant, Dr. Lloyd opined that "effort is the most parsimonious explanation." She said Defendant was effortful at Butner. He insisted he was competent and wanted to prove it. *Id.* at 127-28.

Dr. Lloyd stated that Defendant's decline could be explained if there was a precipitating

18

event between the two tests, such as another traumatic brain injury. But she had no knowledge of such an event. D.E. 749 at 128.

Before the defense began cross-examination of Dr. Lloyd, Defendant signaled to the Court that he wished to speak privately with his attorney.[1] D.E. 749 at 130. After this consultation with Defendant, defense counsel asked Dr. Lloyd whether Defendant's apparent decline between the Butner evaluation and Dr. Wygant's evaluation could have been precipitated by seizures. Dr. Lloyd replied that could be an explanation. But to render an opinion she would need to know the number of seizures, their severity, and their relationship in time to Dr. Wygant's testing. *Id.* at 130-31. When the government objected to this line of questioning, defense counsel explained he had just learned from Defendant that Defendant had been "put on medication at the detention center . . . for seizures." *Id.* at 131.

Presentation of evidence was concluded, and the defense requested seven days to investigate Defendant's reported seizures. Defense counsel indicated that, if his investigation warrants it, he might file a motion to reopen the hearing. The Court set a follow-up teleconference.

During a teleconference on April 22 (*see* D.E. 716), defense counsel reported that medical staff at the Laurel County Correctional Center confirmed Defendant was on anti-seizure medication. The staff member said Defendant told them he had recently suffered a seizure, and in fact had suffered several seizures over the past "year-plus." Defense counsel did not know whether any seizures occurred at Butner. Defense counsel said he received a call from Defendant's mother on Saturday. She told counsel that an inmate had called her to inform her Defendant had suffered a seizure that morning. Counsel later spoke to Defendant, who also said he had suffered a seizure

---

[1] Due to COVID restrictions, defendants and their attorneys sit at separate tables. They can converse via headphones. But to do so, one of them must ask the Court for a break. Defendant asked to speak to his attorney three times during the hearing. D.E. 749 at 18, 57, 130.

on Saturday (apparently April 17) in the presence of an officer known only as the "weekend sergeant." Defendant told counsel his anti-seizure medication was subsequently increased. Defense counsel was not aware of any diagnosis, and hoped he could get in touch with the "weekend sergeant."

On the theory that Defendant's seizures could potentially explain the discrepancies between the Butner Report and Wygant Report, defense counsel moved, via eVoucher, to hire a neurologist (Dr. E. Andy Akan, M.D., of Dyer, Indiana) as a defense expert under 18 U.S.C. § 3306A. *See* D.E. 722. Because the "key question" had become "whether Defendant's seizures since his return to this District [could] have caused his competency to deteriorate below his performance observed at Butner," the Court granted the motion via eVoucher on May 28, 2021. Dr. Akan then examined Defendant at the Laurel County Correctional Center on August 9, 2022, and issued a report dated August 22, 2021. The Akan Report was provided to the government (D.E. 733), and the government asked to review Dr. Akan's underlying data (D.E. 735). On September 14, the Court ordered the parties to submit possible dates when experts from both sides would be available to testify by video. D.E. 736. It was not until December 3, 2021, that the parties submitted January 21, 2022, as the date that the experts were available. D.E. 761. The Court set a hearing for that date.

## VI. The Akan Report

Dr. Akan explained that he based his analysis on (1) a telephone interview of Defendant's mother, (2) Defendant's recital of his own history during the August 2021 jail interview, (3) reading the three prior competency reports, and (4) Defendant's performance on the St. Louis University Mental Status (SLUMS) exam. Akan Report at 3, 5. Dr. Akan's report contains the now-familiar history as told by Defendant and his mother. Defendant sustained a significant head

20

trauma in a January 2010 vehicle accident that left him in a coma for a month.  After that, he was different—more agitated, impulsive, childlike, sometimes depressed, with a speech impediment. *Id*. at 3-4, 6.

As for seizures, Dr. Akan notes that Defendant suffered seizures during rehab, for which he was prescribed Keppra.  Akan Report at 3.  Additionally, Defendant "had breakthrough seizures at one point when his prescription, Keppra was discontinued while in a mental health facility."  *Id*. at 4.  Finally, Defendant told Dr. Akan that "his last seizure had been approximately 1 year prior [to the August 2021 interview]."  *Id*.

Dr. Akan's description of Defendant's seizure history is interesting because, as noted in Section V, Defense counsel previously told that Court that Defendant had reported having "several" seizures "over the last year plus," with one seizure occurring around April 17, 2021, and observed by the "weekend sergeant" at the Laurel County Correctional Center.  Defense counsel made these statements during the April 22, 2021 teleconference and repeated the assertions during the August 31, 2021 teleconference.  Yet Dr. Akan was not aware of any seizures occurring after August 2020.

> Among his observations of Defendant, Dr. Akan noted that Defendant
>
> was somewhat slow to respond, sometimes requiring repetition of questions multiple times.  His speech was stuttering in quality with diminished prosody and intermittent word finding difficulty.  He was alert and oriented to person, month, date, year, town, and facility.  He was able to spell the word "world" backwards up to the "L."  He exhibited poor insight when asked what he would do if he found an addressed and stamped envelope on the ground next to a mailbox; he stated he would not touch it even after continued prompting.

Akan Report at 5.

Concerning the administration of the SLUMS evaluation, Dr. Akan noted:

He was oriented to month, day of the week, year, and state.  He was able to perform simple math.  He was able to name 12 animals in 1 minute.  He could only

remember 2 out of 5 objects utilizing short-term memory. He was unable to complete repeating a series of numbers backwards if greater than 3 digits. He correctly placed the numbers 1 through 12 on a clock face and was able to place the hour markers at 10 minutes to 11 o'clock. He was able to recognize the shape of a triangle but could not discern the largest shape within a choice of 3. When told a complex story, he was only able to answer correctly 2 of the 4 questions posed about the story. His total SLUMS score was a 20 out of 30 which corrected for age was consistent with a neurocognitive disorder on the borderline of dementia.

Akan Report at 5-6.

Dr. Akan's ultimate opinion is as follows:

In my opinion, within a degree of reasonable medical certainty, I do not believe Mr. Lowe has the mental capacity to understand the nature and consequences of his prior actions or concurrent legal proceedings. His poor judgment, lack of insight, decreased executive function, and childlike quality make him vulnerable to suggestions from outside parties and incapable to make rational decisions or provide effective testimony during his trial. In addition, during his history and physical exam, I did not appreciate evidence for malingering or a factitious disorder.

Akan Report at 6-7.

Several observations are warranted at this juncture. First, at no point does Dr. Akan's report quote the *Dusky* standard or specifically tie the elements of the *Dusky* standard to Defendant's particular psychological defects. Second, the report appears to include an opinion that Defendant was not legally sane at the time of the offense ("I do not believe Mr. Lowe has the mental capacity to understand the nature and consequences of his prior actions[.]"). None of the prior reports reached this question. Dr. Akan's report provides little analysis to support this conclusion. In fact, the report does not suggest any familiarity with the facts underlying the charged offense, and it offers no explanation of how Defendant's psychological defects interacted with those facts. Finally, even though the earlier reports wrestled extensively with whether and how Defendant may have been malingering or exaggerating his symptoms, Dr. Akan's report contains only a single line on this topic, a completely subjective impression—"I did not appreciate

evidence for malingering or a factitious disorder."

## VII.  The January 2022 Hearing

At the continuation of the final competency hearing on January 21, 2022, Dr. Akan testified by video on behalf of the defense.  The evaluators from Butner—Drs. Lloyd and Pennuto—also appeared by video at the government's request, but only Dr. Lloyd testified.  D.E. 767, 768.  The proceeding was audio recorded, and the Akan Report was entered into evidence.

Dr. Akan testified that he is a board-certified "general neurologist."  He has worked in private practice since 2005, and is employed by a hospital chain, where he is currently medical director of a "stroke program."  He sees 25 to 30 patients a day for diagnosis and treatment of nervous system disorders.

When asked about his report's references to dementia, Dr. Akan explained that dementia is a permanent loss of cognitive function (as opposed to delirium, which is a temporary loss).  He did not diagnose Defendant with dementia.  But the SLUMS test indicated a "borderline cognitive deficit."

When asked about whether he was familiar with the legal standard for competency to stand trial, Dr. Akan explained that he was using the medical term "capacity" rather than "competency."  It was his medical opinion that Defendant lacked the "capacity" to understand his prior actions or the legal proceedings.  He said Defendant's decreased executive functioning leaves him childlike and vulnerable with a lack of insight.

Dr. Akan was asked why he disagreed with the Butner Report's finding that Defendant's competency had been restored.  Dr. Akan replied that Defendant exhibits the "classic sequelae" of traumatic brain injury.  He has multiple symptoms of frontal lobe damage, including impulsivity, irritability, and anger issues.  He said, "It's our frontal lobes that make us adults," and Defendant's

23

frontal lobe is damaged.

On cross-examination, Dr. Akan acknowledged that, unlike the Butner examiners, he has no training in administering a full battery of psychological tests, such as objective tests for detecting malingering. He agreed that he was not a "forensic" neurologist. Although he had done expert witness work, this was his first time appearing as an expert witness in the criminal justice system for a person who was not his patient. Dr. Akan was rendering an opinion on "capacity," which is an opinion he frequently renders in non-criminal proceedings.

Dr. Akan agreed that Defendant poses a risk of malingering. Yet Dr. Akan did not administer any objective test of Defendant's effort. He acknowledged that the last line of his report contained his subjective opinion on whether Defendant had malingered. He testified he did recall malingering being discussed in the prior reports. He explained that he has many patients who come seeking a disability determination, so he understands that people are often trying to get something out of him. He also agreed with the prosecutor that "humans are lousy lie detectors." He acknowledged it was possible that Defendant had malingered during his examination.

Dr. Akan acknowledged that the SLUMS test is a screening measure, not a comprehensive exam that explores various areas of psychological functioning. He uses screening measures like SLUMS to determine whether a patient needs to be referred to a neuropsychologist for a full-battery exam. But he considered his time with Defendant to constitute a full neurological exam.

When asked whether Defendant's psychological health could have degraded since the Butner exam, Dr. Akan stated that patients' acuity can wax and wane, but he possessed no "organic" reason for thinking that Defendant had degraded since Butner. Dr. Akan agreed that he had performed no imaging tests on Defendant, as they had only interacted at the jail.

Upon questioning by the Court, Dr. Akan explained he diagnosed Defendant with post-

traumatic brain injury with mild cognitive deficits.  He described Defendant as suffering "moderate" neurocognitive disorder overall.  Defendant's history is consistent with frontal lobe damage, which is a significant brain injury that may not appear on imaging tests such as MRIs.

As for seizures, Dr. Akan explained that Defendant appears to have a history of complex partial seizures.  They create an altered state of consciousness, not full loss of consciousness.  These seizures can also be subclinical, meaning they can happen without being detected except by EEG.  Dr. Akan testified that seizures can cause cognitive deficits over time.  But he had no way of knowing the severity of Defendant's past seizures and could not render an opinion as to whether any of Defendant's cognitive deficits are the result of seizures.  Dr. Akan testified he was only aware of three full-blown seizure incidents:  in rehab, when his Keppra prescription lapsed, and the one seizure Defendant spoke of having one year prior to the exam.

In her testimony, Dr. Lloyd emphasized the need for objective effort measurements.  She explained that in a forensic setting—as opposed to a clinical setting—the subject is motivated to avoid prosecution or at least lower their culpability.  Clinical patients, in contrast, are trying to get a problem fixed, so they are unlikely to feign and exaggerate symptoms.  In light of these differing incentives, using objective effort measurements is part of the "standard of care" in forensic psychology.  Detecting malingering is especially relevant here, where Defendant has a history of low effort and intentional exaggeration.  Although Dr. Akan testified that Defendant had mild cognitive deficits, Dr. Lloyd did not believe Dr. Akan's exam included cognitive testing.  Dr. Akan's report also failed to include anything from Dr. Pennuto's cognitive testing, which included a CT scan, MRI, and effort tests.

Dr. Lloyd testified that the SLUMS test is a screener used for triggering further evaluation or assessment.  She said uch screeners are not good measures for making diagnoses.  Dr. Lloyd

found nothing in Dr. Akan's report that indicated lack of competency, by which she meant cognitive deficits that could impair Defendant's ability to participate in and understand trial proceedings.

## VIII.  Analysis

Before the Court are four separate evaluations.  The first two reports, rendered following full custodial evaluations, have received no criticisms for their methodology.  They accurately state the *Dusky* standard and describe in detail how that legal standard relates to the evaluators' findings.  The Butner report by Drs. Lloyd and Pennuto was especially thorough.  The reports by Dr. Wygant and Dr. Akan, in contrast, were heavily criticized by Drs. Lloyd and Pennuto for either using questionable methodology or rendering opinions beyond the capability of the testing measures.

First, the Houston report was thorough but ended with a cautious conclusion.  While the evaluators at Houston found evidence of cognitive defects that could equate to lack of competence, they also found evidence Defendant was malingering or exaggerating.   As that opinion summarized:

> Mr. Lowe presented with an insufficient factual knowledge about the charges he is facing with limited understanding of the behaviors to which the charges refer, but this may be exaggerated.  He showed a limited ability to recall some aspects the investigative interview he participated in and recognized the severity of the charges. Mr. Lowe exhibited rudimentary verbal skills; however, his language comprehension is potentially inadequate to communicate effectively with counsel and assist in his defense.  Mr. Lowe's appreciation for the likely outcome of the proceedings was intact.  A review of basic knowledge of legal strategies and options revealed limitations in his understanding of various pleas.  There were observed deficits in his ability to make a reasoned choice about defense options.  He lacked an understanding of the role of courtroom personnel.  Mr. Lowe has the ability to manifest appropriate courtroom behavior, participate in trial, but his ability to testify relevantly is questionable.  An absence of critical medical records to substantiate the alleged disabilities handicapped the assessment process.  Based on available data, there are multiple indications of a possible major mental defect that might impair his ability to rationally understand the nature and consequences of the

> proceedings. However, this coincides with indications the above referenced deficits may be exaggerated which muddles the clarity regarding his true competency abilities.
>
> . . . .
>
> Mr. Lowe did appear to possibly suffer from a mental defect rendering him unable to understand the nature of the proceedings against him or to properly assist in his defense. However, the confound of indications of Malingering threaten the clarity of his true competency abilities. It is this Evaluator's opinion a conservative approach should be taken and he be declared not competent to proceed.

D.E. 246 at 11. The report thus recommended that Defendant be "committed to a federal medical center for further assessment and treatment for restoration[.]" *Id*. at 12.

Further custodial assessment and treatment did occur. And the highly qualified team of Drs. Lloyd and Pennuto at Butner found insufficient evidence to diagnose Defendant with any psychological disorder aside from moderate stimulant use disorder in a controlled environment. They found him competent to stand trial without reservation. D.E. 575.

Dr. Lloyd testified that the likely explanation for why Defendant appeared competent at Butner but not with Dr. Wygant boiled down to his level of effort:

> When Mr. Lowe was at FMC Butner, he was motivated to demonstrate his competency related skills. He was clear that he perceived himself to be competent, that he did not think he ever needed to come here in the first place, and so was effortful in providing thorough answers and working with me. I'm not sure that that was the case with Dr. Wygant.

D.E. 749 at 128.

Dr. Wygant found Defendant not competent, but the persuasive power of his conclusion is undermined by (1) his repeating the same effort tests that were administered at Houston and Butner and (2) basing much of his conclusion on a battery of questions he developed himself, rather than using industry-standard measures of competence to stand trial.

Dr. Akan also opined that Defendant is not competent to proceed. But his report warrants

little weight. Dr. Akan does not accurately state or interact with the *Dusky* standard. In fact, he testified that he was rendering an opinion on "capacity," as used in a medical setting. He had no prior experience as an expert witness for a non-patient in a criminal setting. Dr. Akan only administered one test, and that test was a clinical screener. It was not a forensic tool and it contained no mechanism for detecting malingering.

Here, the Butner report and the testimony of its authors are simply more credible than the opinions of Dr. Wygant and Dr. Akan. At Butner, where Defendant was motivated to prove his competence, he performed so well on cognitive testing and on competency measures that he was diagnosed with no cognitive impairment. His evaluators' credentials are impeccable and their whole careers are devoted to forensic evaluations of criminal defendants. Their independence has not been challenged and they struck the Court has thoughtful, extremely qualified, and candid professionals. Defendant was found disabled in civil court in April 2010. D.E. 153-1. But that judgment was rendered not long after his vehicle accident, and the Court agrees with Dr. Pennuto that, eleven years later, that judgment is due to be reassessed. D.E. 749 at 123.

The issue before the Court is whether Defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960); *see also* 18 U.S.C. § 4241(a) (phrasing test as whether defendant is "unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense"). The most thorough and credible assessment under this standard is the assessment at Butner, which in turn built upon the examination at Houston. The Butner evaluation, which the Court finds credible, establishes that Defendant is competent under *Dusky*.

Further, Defendant has demonstrated his competency by his own actions before this Court.

During the April 2021 hearing, Defendant interrupted the proceedings to talk to his lawyer three times. D.E. 749 at 18, 57, 130. The last time, he told his lawyer that he had been suffering seizures. This information (new information known only to Defendant and not his attorney) was directly relevant to the proceedings.

Dr. Lloyd had just been testifying as to why she thought Defendant performed more poorly at Dr. Wygant's evaluation. When asked why Defendant could identify certain court personnel and procedures at Butner but not with Dr. Wygant, Dr. Lloyd testified it probably boiled down to effort and motivation. D.E. 749 at 127-28. Although the change could be explained by an intervening brain injury, Dr. Lloyd was aware of "no documented evidence" of such a "precipitating event." *Id*. at 128.

Having just heard this testimony, Defendant sprang into action and told his lawyer about a previously unknown potential precipitating event—seizures. Defendant clearly was understanding the hearing, despite its technical nature. He purposefully injected the seizure issue and must have understood its potential impact. Defendant's lawyer then immediately used this new, relevant information from Defendant and began a line of questioning to Dr. Lloyd as to whether seizures that occurred post-Butner could have negatively impacted Defendant's competency. D.E. 749 at 130-32. When the government objected, defense counsel explained: "my response to the objection, Your Honor, is that this is information that I just got from Mr. Lowe, and it seems relevant to the topic that we're addressing here. He tells me he's been put on medication at the detention center for something for seizures." *Id*. at 131.

This interaction amounted to a live demonstration that Defendant was capable of understanding the Court proceedings and of assisting in his own defense. He in fact did assist in his defense, as his last-minute revelation to his attorney resulted in the significant continuation of

29

these proceedings and the production of an additional competency opinion favorable to the defense.  Given that the Butner report is the most credible of the reports and that Defendant demonstrated in Court his ability to understand the proceedings and to assist his defense, the evidence as it stands preponderates in favor of finding Defendant is competent to proceed under the *Dusky* standard.

## IX.  Conclusion

For the reasons discussed above, per 18 U.S.C. § 4241(a), Defendant is able to understand the nature and consequences of the proceedings against him and to assist properly in his own defense.  Therefore, the undersigned **RECOMMENDS** that the District Judge find that Defendant is competent to face further proceedings in this matter.  In the event this recommendation is adopted, Defendant will need to be arraigned on the Second Superseding Indictment.  Also, until now, the status quo has been the Court's previous ruling that Defendant was not competent to stand trial.  As such, Defendant has not been evaluated as to sanity at the time of the offense, except that Dr. Akan opined that Defendant lacks "the mental capacity to understand the nature and consequences of his prior actions[.]"  Akan Report at 6; *see also* Houston Report at 12 ("Given Mr. Lowe is opined to be incompetent to stand trial, an opinion regarding sanity at the time of offense was not rendered.  In the event he is restored to competency he may then be evaluated for sanity at the time of offense.").

The Court issues this Recommended Disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  The parties should consult that statute and Federal Rule of Criminal Procedure 59(b) concerning the right to appeal to the District Judge.  At the hearing, defense counsel requested an extension of the objections period due to his travel schedule.  As stated on the record, any objection must be filed on or before **March 4, 2022**.  Failure to object per Rule 59(b) waives a party's right to review.

Upon expiration of the objections period, this matter will be referred to Judge Wier for his

consideration.

To facilitate review, **IT IS HEREBY ORDERED THAT** the Clerk of **Court SHALL**

**FILE UNDER SEAL** the attached report of Dr. Akan and his CV.

This the 26th day of January, 2022.

**Signed By:**

*Hanly A. Ingram*

**United States Magistrate Judge**